IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA

v.                                          Criminal No. 24-166

LEON T. BERRY

## BRIEF IN SUPPORT OF DETENTION

The defendant is an illegal alien with almost no family ties to the United States who lied repeatedly during his pretrial services interview, and who delivered approximately half a million dollars' worth of cocaine to an individual in the Western District of Pennsylvania. Given his repeated falsehoods in his pretrial services interview, the defendant has not produced even "some *credible* evidence" to rebut the presumption in favor of detention. Furthermore, given the evidence introduced at the detention hearing, there is no condition or combination of conditions that would protect the community from the defendant's ongoing involvement in large-scale drug trafficking, or ensure his appearance at trial. Therefore, the defendant must remain detained pending trial.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.  *Berry Caught with Over $350,000 Cash in April 2024*

On April 3, 2024, Leon Berry, the defendant, was driving his wife's vehicle, with a passenger in the front seat, in Cleveland, OH, when he was pulled over by local police. (Transcript ("Tr.") at 24; Ex. 7). During the stop, a K-9 officer deployed his K-9 partner, which alerted to the odor of narcotics in the rear passenger seat area of the vehicle. (Tr. at 24; Ex. 7). Investigators determined that the odor of narcotics was emanating from a Home Depot box in the back seat of the vehicle. (Tr. at 24; Ex. 7). That box was found to contain approximately $350,795 in bulk cash, bundled with rubber bands. (Tr. at 24; Ex. 7). Both Berry and his passenger denied ownership of the money.

1

### B. *Berry Delivered 16 Kilograms of Cocaine in July 2024*

On July 6, 2024, Nicoy Roache (Berry's codefendant) attended a meeting in Cleveland in which he and other individuals (including a Pittsburgh-based customer) made plans to initiate the distribution of large quantities of cocaine to the Pittsburgh area. During this meeting, one of the coconspirators emphasized the need to trust the individuals with whom he worked. (Tr. at 15-16). At this meeting, Roache and his coconspirators arranged to deliver 17 kilograms of cocaine to another individual present at the meeting (the "Pittsburgh customer"). The delivery was to occur the following day, July 7, with a second delivery to occur a few days after that, and future deliveries to occur every one to two weeks thereafter. (Tr. at 16).

Roache was designated as the point of contact moving forward for all drug trafficking logistics with respect to this arrangement, including making or modifying future orders. (Tr. at 16). Following this meeting, Roache and the Pittsburgh customer went to Target to purchase cell phones that they would use to exclusively communicate with each other regarding drug trafficking. (Tr. at 16). After purchasing the phone, Roache's coconspirator again confirmed that they would be sending 17 kilograms of cocaine to the Pittsburgh customer the following day, at a price of $15,500 per kilogram. (Tr. at 16-17). In Pittsburgh, a kilogram of cocaine typically resells for approximately $20,000 per kilogram, but can be worth much more if broken down into ounce-quantities, as an ounce of cocaine typically sells for approximately $1,000. (Tr. at 20-1). Therefore, while Roache and his coconspirators would be charging a total of $263,500, the retail value of the 17 kilograms of cocaine was between $340,000 and $612,000.

Later that evening, the Pittsburgh customer proposed Building 2 of the Meeder Flats apartment complex in Cranberry, PA as the location at which Roache would meet the customer to complete the deal (the "meet location"). (Tr. at 17; Ex. 1). On July 7, investigators set up surveillance in the area, and used a surveillance aircraft with video-recording capabilities to assist. (Tr. at 17). At approximately 10:45 AM, investigators saw a Dodge Charger registered to Roache

2

traveling on the turnpike near Cranberry, in tandem with a Nissan Rogue registered to the defendant, Leon Berry. (Tr. at 17).

At around 10:59 AM, the Dodge Charger parked at the meet location, and Roache got out of the front passenger seat of the Charger. (Tr. at 17-18; Exs. 2A and 2B). The Charger then drove around the corner to a different area of the parking complex and parked a few spots down from the defendant's Rogue. (Tr. at 18; Ex. 2C). Roache met and talked with the Pittsburgh customer, who was standing on the sidewalk. (Tr. at 18; Ex. 2D and 2E). As this was happening, the driver of the Charger, later identified as Raymond O'Reilly, Jr., exited the Charger walked back towards the meet location. O'Reilly, Jr. walked to a point where he appeared to make visual contact with Roache, then walked to Berry's Rogue and got in the front passenger seat. (Tr. at 18; Exs. 2F and 2G). After less than 30 seconds, O'Reilly exited Berry's Rogue, and Berry then drove to the meet location. (Tr. at 18; Exs. 2H and 2I).

Upon arriving at the meet location, Berry exited the driver's seat of the Rogue, greeted Roache and the Pittsburgh customer, and opened the rear hatch of the Rogue for them. (Tr. at 18-19; Ex. 2I to 2N). Berry then reached into the rear cargo area of the vehicle and pulled out a box. (Tr. at 19; Exs. 2N-2O). While Berry stood there watching, Roache and the Pittsburgh customer began to open and manipulate the box. (Tr. at 19-20; Exs. 2P-2Q). The Pittsburgh customer then took the box and began to walk away, at which point investigators moved in to detain everyone. (Tr. at 20; Ex. 2R).

The box delivered by Berry contained 16 kilograms of suspected cocaine; 7 of the kilograms were field tested and tested positive for cocaine. (Tr. at 20; Ex. 3). The kilograms were covered in some sort of oil or petroleum-based product, which is commonly used by large-scale drug traffickers to mask the smell of narcotics and foil drug-sniffing dogs. (Tr. at 20). Additionally, the methods used by Roache and Berry – using multiple vehicles to effectuate the drug deal, obtaining cellular phones specific to the individuals engaged in drug trafficking, and

having one member of the conspiracy (Roache) meet with the customer before another member of the conspiracy (Berry) delivered the narcotics – were all consistent with a sophisticated, large-scale drug trafficking organization.  (Tr. at 21).

### C. *Berry's Repeated Falsehoods*

Following his arrest on July 6, indicated he wanted to speak with FBI investigators.  Berry informed them that an individual, who he later identified and who was one of the individuals present at the July 6 meeting, had asked Berry to deliver a package of marijuana to Pittsburgh on July 7, and offered Berry $1,000 to drive it there.  Berry indicated he was instructed to follow Roache's Charger, and claimed he did not know Roache.  (Tr. at 21).  However, this appeared to be false:  one of Berry's cellular phones contained a photograph, taken by Berry's phone on December 5, 2023, of a drug ledger (or "owe sheet").  According to the metadata, this photograph was taken at Roache's residence.  (Tr. at 21-22; Exs. 12, 13A, 13B, and 14-16).  The drug ledger referenced large quantities of money ("565,915, little bro get 4,000" and "554,509").  (Ex. 12).  Furthermore, had the box contained marijuana as Berry alleged, it is likely that its odor would have been immediately apparent, even if it was vacuum sealed.  (Tr. at 22).

The government also introduced evidence that the defendant was an illegal alien from Jamaica who arrived in the United States in the fall of 2020, and that he had a prior conviction for simple larceny from Jamaica.  (Tr. at 25; Exs. 10 and 11).  When he was initially found to be in the country illegally in 2020, the defendant was released on a $10,000 immigration bond to an address in Florida.  (Tr. at 25; Ex. 8).  He is currently the subject of an ICE detainer, and new immigration charges have been filed against him in the instant case.  (Tr. at 25; Ex. 9).  As a result of those new immigration charges, he is not eligible for release in connection with the pending immigration case.  (Tr. at 25; Exs. 8 and 9).

During his interview with the FBI, and also in his interview with Pretrial Services, Berry claimed to have a construction business registered in Braddock, PA.  (Tr. at 23; Bond Report

("BR") at 2). In fact, during his Pretrial Services interview, Berry claimed that he had started this business, "Elite Construction" in October 2021, and that he earned $5,416.67 in monthly income from the business. (BR at 2). He also claimed that he worked for a "Rob Metcalfe" in Pittsburgh from November 2020 until December 2023, also making $5200 per month. (*Id.*).

However, a financial investigator was unable to locate any evidence that Berry owned, worked for, or was in any way associated with an "Elite Construction," or that he had any gainful employment. This investigation included queries of law enforcement databases as well as open-source research. (Tr. at 23; Exs. 5-6). Investigators also searched the contents of all three of the cellular phones recovered from the defendant, and did not find a single reference to Elite Construction. (Tr. at 24). Finally, the defendant has never reported any wages to the Pennsylvania Department of Labor and Industry. (Tr. at 23). Therefore, other than the defendant's self-serving statements, which the Probation Office confirmed they could not verify, there is no evidence that the defendant owned or was affiliated with any construction company, or with Elite Construction, or that he has any prior, gainful employment in Pennsylvania. (Tr. at 24; *see also* BR at 1 ("Pretrial services was unable to verify the information below with a collateral contact.")).

In addition to lying about his employment, the defendant also lied about his address – he claimed in his Pretrial Services Interview that he has resided at a specific address in Braddock, PA with his sister since January 2022. (BR at 1). However, searches of law enforcement databases for that address revealed no association between Berry and his sister with that address – if they had lived there for over two years, these databases would have revealed some sort of association between them and that address. (Tr. at 31). When he was arrested, the defendant was in possession of an Ohio driver's license that was issued in September 2023, with a listed address in Euclid, Ohio. (Tr. at 25; Ex. 17).

During his Pretrial Services interview, the defendant described his family as consisting of nine people. Eight of those people reside in Jamaica. (BR at 1-2). The defendant's sole family

member in the United States is apparently incarcerated in Ohio in connection with immigration proceedings. (Tr. at 25; Ex. 18).

In an effort to rebut the presumption of detention, the defendant relied on the (unverified) bond report and introduced two exhibits. (Tr. at 28; Def. Exs. A and B). Defense Exhibit B was a marriage license, showing that the defendant was married. The defendant's wife lives at 337 Verona Road Dayton, OH. (Tr. at 27). This residence is almost 3 ½ hours away from the Euclid, OH address on Berry's driver's license, and is over 4 hours away from the address in Braddock, PA where he claimed to be living for the past two and a half years.

The defendant also included a letter purporting to be from "Ramney George Thompson" of "430 Yew Way Braddock Pittsburgh Pennsylvania," from "RNT COMPLETE REMODELLING [sic] LL". Mr. Thompson's unfamiliarity with Pittsburgh addresses may be excused given that he apparently has a Bronx, NY area code. (Def. Ex. A).

In this letter, "Mr. Thompson," who was not present at the detention hearing, indicated he has known the defendant for "the past four years," and that the defendant has worked with him continuously for "approximately three years." (Def. Ex. A). Aside from the fact that the defendant did not include this "continuous work" for "Mr. Thompson" during his pretrial services interview, it does not appear that "Mr. Thompson's" business has been in existence for three years. Below is a screen shot of the results of a Pennsylvania Department of State Business Search RNT Complete Remodeling:



This appears to be Mr. Thompson's "RNT COMPLETE REMODELLING LL", given that the listed address is 430 Yew Way Braddock, PA.  However, the company was not started until August 2023.

Furthermore, much like the defendant's "Elite Construction," there is little evidence to suggest that RNT Complete Remodeling LLC is an actual, functioning company.  For example, below is the Google Street View image for 430 Yew Way in Braddock:



Similarly, a simple Google Search for "Complete Remodeling LLC Braddock PA" does not reveal any indication that this company actually exists.[1]  Therefore, much like the defendant's "Elite Construction," "COMPLETE REMODELLING LL" does not appear to exist.

At the close of the evidence, the Court indicated that because the Probation Office was recommending release, the Court found that the presumption in favor of detention had been rebutted.  (Tr. at 43).  However, minutes after the hearing was concluded and the proceeding adjourned, the Probation Office communicated to all parties that, in light of the evidence submitted at the detention hearing, they were changing their recommendation from release to detention.

The Court directed the parties to file briefs addressing (1) whether and to what extent the Court can consider whether the defendant is releasable in his immigration proceedings, and the weight the Court can and should give to the immigration detainer; and (2) application of the facts in the record to the 18 U.S.C. § 342(g) factors.

## II.    <u>**ARGUMENT**</u>

The mere fact of an ICE detainer should have no impact on the Court's decision under the Bail Reform Act, though a defendant's immigration status can be considered to the extent it impacts the § 3142(g) factors.  That being said, detention is still appropriate because (1) the defendant has not rebutted the presumption in favor of detention and (2) the § 3142(g) factors indicate detention is necessary.

### A.  **IMPACT OF ICE DETAINER**

In *Soriano Nunez*, the Court of Appeals for the Third Circuit explored the relationship between the Bail Reform Act and the Immigration and Naturalization Act's detention provisions. 928 F.3d 240, 242-43 (3d Cir. 2019).  While the Court was deciding whether the defendant could be detained under the INA after being granted release under the BRA, in doing so it provided

---

[1] There is apparently a "Complete Remodel LLC" based on Florida.  *See* https://www.facebook.com/CompleteRemodelLLC/

described the impact that INA proceedings, including detainers, have on BRA determinations.  For

example, the Court stated that other than the temporary detention provision set forth in § 3142(d),

> individuals on release from other offenses and non-citizens are treated the
> same as other pretrial criminal defendants under the BRA.  *See, e.g.*, *United
> States v. Santos-Flores*, 794 F.3d 1088, 1091 (9th Cir. 2015) (stating that
> the possibility of removal by immigrant authorities cannot provide the sole
> basis for denial of BRA release.))

*Soriano Nunez*, 928 F.3d at 244-45.  The Court expanded, in a footnote, that "the presence of an

ICE detainer and the threat of potential removal alone are not sufficient to deny BRA pretrial

release."  *Id.* at 245 n.4 (citing *United States v. Ailon-Ailon*, 875 F.3d 1334, 1338-39 (10th Cir.

2017)).  Therefore, "'detention of a criminal defendant pending trial pursuant to the BRA and

detention of a removable alien pursuant to the INA are separate functions that serve separate

purposes and are performed by different authorities.'"  *Id.* at 245-46 (quoting *United States v.

Vasquez-Benitez*, 919 F.3d 546, 552 (D.C. Cir. 2019)).

That being said, the Court should not ignore a defendant's immigration status, including

the likelihood of being deported, when assessing the BRA factors.  *United States v. Odeyale*, 2024

WL 2747542 (10th Cir. 2024) (per curiam); *see also United States v. Townsend*, 897 F.2d 989,

995 (9th Cir. 1990) (discussing factors to consider when assessing alien defendant's ties to United

States).  Therefore, the fact that a defendant faces deportation or an extensive sentence contributes

to the risk-of-flight analysis, as these consequences provide a motive to flee.  *Odeyale*, 2024 WL

274542, *4; *Townsend*, 897 F.2d at 995 (finding that significant potential sentences created greater

risk of flight).  Some other factors to consider, when assessing an alien defendant's ties to the

United States for purposes of the § 3142(g) factors are: "how long the defendant has resided in this

country, whether defendant has been employed in the United States, whether defendant owns any

property in this country, and whether defendant has any relatives who are United States residents

or citizens.".  *Townsend*, 897 F.2d at 995.  It is worth noting that the defendants in *Townsend* were

not alleged to have been in the United States illegally, but rather were foreign nationals indicted and detained in the United States. *Townsend*, 897 F.2d at 991-93.

Therefore, while the ICE detainer and the defendant's immigration status are not dispositive, the defendant's immigration status and his lack of ties to the United States can be considered when assessing whether release or detention is appropriate under the Bail Reform Act.

## B.  THE PRESUMPTION WAS NOT REBUTTED

The defendant has not rebutted the presumption in favor of detention because he has not produced *any **credible*** evidence to rebut the presumption.

If there is probable cause to believe that the defendant committed a violation of the Controlled Substances Act punishable by ten or more years of incarceration, a rebuttable presumption arises that no condition or combination of conditions will assure the appearance of the person and the safety of the community.  18 U.S.C. § 3142(e)(3)(A) and (B).[2]

To rebut the resumption, "the defendant must produce ***some <u>credible</u> evidence*** forming a basis for his contention that he will appear and will not pose a threat to the community."  *United States v. Carbone*, 793 F.2d 559, 560 (3d Cir. 1986) (emphasis added).  Evidence pertaining solely to community ties is insufficient to rebut a presumption of dangerousness.  *United States v. Delker*, 757 F.2d 1390, 1396 (3d Cir. 1985).  Furthermore, "character and lifestyle" evidence is also of limited value in addressing concerns regarding danger to the community.  *See United States v. Strong*, 775 F.2d 504, 508 (3d Cir. 1985) (noting, in context of defendant seeking release pending sentencing, that "character and lifestyle" evidence failed to rebut presumption of dangerousness); *but see Carbone*, 793 F.2d at 561 (noting defendant's evidence of character, family ties,

---

[2] The government has established probable cause that the defendant committed an offense punishable by ten or more years of incarceration, both by virtue of the evidence presented at the hearing and the fact of the Indictment itself.  *United States v. Suppa*, 799 F.2d 115, 118-19 (3d Cir. 1986).

employment history, and length of residence in community, including fact that neighbors mortgaged houses to post $1 million for defendant, rebutted presumption of dangerousness).

"The statutory language, as well as the legislative history, unequivocally [sic] establishes that Congress intended to equate traffic in drugs with a danger in the community." *Strong*, 775 F.2d at 506. As the Third Circuit and Congress have observed,

> The [Judiciary] Committee intends that the concern about safety be given a broader construction than merely danger of harm involving physical violence. ... **The Committee also emphasizes that the risk that a defendant will continue to engage in drug trafficking constitutes a danger to the "safety of any other person or the community."**

*Id.* (quoting S. Rep. No. 225, 98th Cong., 2d Sess. 12-13) (emphasis added by Court in *Strong*). And such a risk is particularly likely based on the nature of the conduct involved in drug trafficking:

> It is well known that drug trafficking is carried on to an unusual degree by persons engaged in continuing patterns of criminal activity. Persons charged with major drug felonies are often in the business of importing or distributing dangerous drugs, and, thus, because of the nature of the criminal activity with which they are charged, they pose a significant risk of pretrial recidivism.

*Id.* (quoting S. Rep. No. 225, 98th Cong., 1st Sess. 20).

In the current case, this Honorable Court initially relied on the Probation Office's release recommendation in finding that the presumption was rebutted. However, the reliance on the Probation Office's release recommendation was misplaced for two reasons.

First, the Probation Office's recommendation cannot be considered "some ***credible*** evidence forming a basis for his contention that he will appear and will not pose a threat to the community." *Carbone*, 793 F.2d at 560 (emphasis added). The Probation Office itself seemed to acknowledge this, as its entire report (and recommendation) was prefaced with the disclaimer that "Pretrial services was unable to verify the information below with a collateral contact." (BR at 1). Therefore, the entirety of the Probation Office's recommendation was based on information

provided by the defendant that was not corroborated or verified in any fashion.  Given the obvious interest the defendant has in obtaining a favorable recommendation from the Probation Office, and the fact that he was the sole, uncorroborated source of the information used by the Probation Office, it is difficult to understand how this recommendation could be considered "credible."[3]

However, the Court was presented with further evidence undermining whatever minimal credibility the Probation Office's recommendation carried; the Court was not left to speculate as to the veracity of the representations the defendant made to the Probation Office.  Specifically, the government introduced evidence establishing that the defendant lied about his work history, as well as his residency within the Western District of Pennsylvania.  According to the bond report, "Rob Metcalfe" paid the defendant over $192,000 over the course of 37 months to work for him, and the defendant earned another $178,750 over the course of less than three years from Elite Construction.  (BR at 2).  However, there was no indication in public records, law enforcement databases, or the defendant's own cell phones that he ever worked with, owned, or was associated with an "Elite Construction."  (Tr. at 23-24; Exs. 5-6).  Similarly, his Bureau of Labor and Industry records show he never reported *any* income, nonetheless income from a "Rob Metcalfe" or Elite Construction.  (Tr. at 23).  Additionally, despite claiming to earn over $370,000 from these two sources of employment the defendant did not present any testimony or evidence from anyone associated with these businesses to verify his employment.

Instead, the defendant introduced Defense Exhibit B, an unsigned letter purporting to be from "Ramney George Thompson" of "RNT COMPLETE REMODELLING [sic] LL".   "Mr. Thompson" claimed to have worked with the defendant continuously for three years, despite RNT

---

[3] It is furthermore somewhat disturbing that the Probation Office would make this recommendation despite the inability to verify the information provided by a large-scale drug trafficker who is also an illegal alien.  Perhaps recognizing this, as described above and below, the Probation Office changed its recommendation following the hearing in this matter.

Complete Remodeling LLC only being in existence for one year.  The credibility, or lack thereof, of Defense Exhibit B, speaks for itself.

Therefore, the defendant has not presented "some *credible* evidence" to rebut the presumption of detention; what little evidence he presented was not credible on its face, and the government introduced significant evidence to further undermine its credibility.  Which leads to the second reason the Court's reliance on the Probation Office's release recommendation was misplaced.

The Probation Office itself recognized the problems with its recommendation.  As described above, almost immediately following the hearing, the Probation Office transmitted the following email to the Court and the parties:

> Good afternoon,
>
> In light of the evidence presented at the detention hearing today and no suitable release plan in place, Pretrial Services is amending our recommendation to detention. Myron, if you establish a home plan for Mr. Berry, please forward along so we can get it verified.

Therefore, the Court relied on a recommendation that has since been reversed in finding that the presumption has been rebutted.  As such, the "some credible evidence" upon which the Court relied no longer exists, the presumption has not been rebutted, and the defendant should remain detained.

### C.  **DETENTION IS REQUIRED PURSUANT TO THE § 3142(g) FACTORS**

Even if the Court were to find that the information contained in the bond report, the accuracy of which is in serious doubt, constituted some ***credible*** evidence to rebut the presumption in favor of detention, detention is still required under the § 3142(g) factors.

### 1.  *The Existence of the Presumption Supports Detention*

First, even if the presumption is rebutted, it "is not erased;" rather, it "remains in the case as an evidentiary finding militating against release, to be weighed along with other evidence

relevant to the factors listed in § 3142(g)." *United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1986). Therefore, the fact that there is probable cause to believe that the defendant committed the offenses described in Counts One and Two of the Indictment weights in favor of detention.

2. ***The Nature and Circumstances of the Offenses Charged Supports Detention***

The nature and circumstances of the offense weigh in favor of detention. A defendant's involvement in large-scale drug trafficking demonstrates both his risk of flight and dangerousness to the community. As one member of this Court noted, "Drug trafficking certainly poses a substantial risk of harm to the community, particularly the trafficking of significant quantities of very dangerous and addictive drugs like heroin and cocaine." *United States v. Oliver*, 2016 WL 1746853, *8 (W.D. Pa., May 3, 2016); *see also United States v. Brinson*, 2020 WL 4736258, *1 (W.D. Pa., Aug. 14, 2020) (noting defendant's role as "a significant distributor for a large-scale heroin trafficking organization," where defendant was responsible for 1-3 kilograms of heroin, as weighing in favor of detention); *United States v. Patricia Murrietta*, 2:20-cr-00218-WSH, Doc. 527 at 14 (Jan. 14, 2021) (defendant's role in transporting drug proceeds of drug trafficking organization weighed in favor of detention); *United States v. Egurrola-Vasquez*, 2021 WL 185043, *8 (W.D. Pa., Jan. 19, 2021) (defendant's role in conspiracy as truck driver transporting multi-kilogram quantities of cocaine weighed in favor of detention); *United States v. Watson*, 2:20-cr-00218-WSH, Doc. 456 at 13-14 (W.D. Pa., Dec. 18, 2020) (defendant's role as courier and distributor of multi-kilogram quantities of cocaine weighed in favor of detention); *United States v. Harris*, 2020 WL 7249339, *4 (W.D. Pa., Dec. 8, 2020 (defendant's involvement in conspiring to distribute kilograms of cocaine "undeniably serious" despite defendant's potentially lesser role in the conspiracy, and weighed in favor of detention).

As Judge Ranjan wrote when denying a defendant's motion to reconsider a detention order:

> While he is potentially a lesser player in the overall conspiracy, [the defendant's] offense is still undeniably serious. He is charged with conspiring to distribute kilogram quantities of cocaine—a substantial

amount of a dangerous narcotic. ECF 2430, p. 1. "The statutory language as well as the legislative history [of the Bail Reform Act], unequivocally establishes that Congress intended to equate traffic in drugs with a danger to the community." *United States v. Strong*, 775 F.2d 504, 506 (3d Cir. 1985). This is especially true with "trafficking significant quantities of very dangerous and addictive drugs like heroin and **cocaine**." *United States v. Oliver*, No. 16-40, 2016 WL 1746853, at *8 (W.D. Pa. May 3, 2016) (Fischer, J.) (emphasis added by J. Ranjan).

*Harris*, 20220 WL 7249339, *4.

If the defendant's charged conduct implicates significant potential penalties, that also weighs in favor of detention. *United States v. Egurrola-Gamboa*, 2020 WL 6826583, *7 (W.D. Pa., Nov. 20, 2020) (fact that defendant faced mandatory minimum of 10 years and up to life weighed in favor of detention); *United States v. Davis*, 2013 WL 6094445, *6 (W.D. Pa., Nov. 20, 2013) (discussing significant mandatory and possible penalties associated with instant charges in finding nature and circumstances of offense weighed in favor of detention); *United States v. Gibson*, 481 F. Supp. 2d 419, 423 (W.D. Pa, Feb. 9, 2007) (same); *see also Townsend*, 897 F.2d at 995 (noting maximum possible sentences defendants faced provided strong "incentive to consider flight") .

The mere fact that a defendant's conduct did not involve violence does not demonstrate that the nature and circumstances of the offense were not serious. *United States v. McHenry*, 2020 WL 3064478, *3 (W.D. Pa., Jun. 9, 2020) (rejecting argument that lack of evidence of defendant committing acts of violence weighed in favor of release because the defendant's involvement in conspiring to distribute one kilogram or more of heroin was "very serious"); *Davis*, 2013 WL 6094445, *6 (same).

The nature and circumstances of the offense in the instant matter certainly weigh in favor of detention. The instant conduct shows the defendant's involvement in "massive drug trafficking." (Tr. at 42). Specifically, the defendant was involved in the interstate distribution of 16 kilograms of cocaine, which had a street value of over half a million dollars in the Pittsburgh

market.  This alone weighs in favor of detention.  *Egurrola-Vasquez*, 2021 WL 185043, *8; *Watson*, 2:20-cr-00218-WSH, Doc. 456 at 13-14; *Harris*, 2020 WL 7249339, *4.   As a result of that conduct, the defendant faces a sentence of ***at least*** ten years and up to life, a fact that also weighs in favor of detention.  *Egurrola-Gamboa*, 2020 WL 6826583, *7; *United States v. Ewell*, 2013 WL 4479029, *2 (W.D. Pa., Aug 20, 2013).  Furthermore, as the Court noted, the defendant "has multiple instances that at least there's significant smoke happening of massive drug trafficking." (Tr. at 42).  That "smoke" includes the seizure of $350,000 in bulk cash, to which a drug dog alerted, from a vehicle driven by the defendant, and the location of a drug ledger on his phone that described over half a million dollars.  The defendant's apparent ongoing involvement in large-scale drug trafficking further weighs in favor of detention, as established by the litany of cases cited above.  Therefore, the nature and circumstances of the offense weigh heavily in favor of detention.

### 3.   *The Weight of the Evidence Supports Detention*

The weight of the evidence against the defendant is also strong.  The defendant was video-recorded, and caught essentially red-handed, participating in what could only be described as a sophisticated, large-scale drug deal.  The defendant was one of three people involved on the distribution end of the transaction, and drove the "load car" containing the narcotics.  The defendant was video-recorded driving to the meet location, opening the rear hatch of his vehicle, and reaching inside to pull out the box containing the kilograms of cocaine.

The defendant invoked a "mere presence argument" to undermine the weight of the evidence.  However, the defendant was not "merely present." He drove a vehicle containing half a million dollars' worth of cocaine from Cleveland, OH to Cranberry, PA, traveling in tandem with other coconspirators, and then physically delivered the box containing the cocaine to the customer.  The defendant was certainly more than "merely present" when he not only drove the "load car," but pulled the drugs out to give the customer.

Furthermore, the defendant's self-serving, and likely false, statement to the FBI only strengthens the government's case.[4]    To convict the defendant of possession with intent to distribute and/or distribution of 5 kilograms or more of cocaine, the government does not need to prove that the defendant knew what type of substance he was delivering or possessing.  Rather, the government need only prove that the defendant "knew that what [he] [distributed and/or possessed with intent to distribute] was a controlled substance under federal drug abuse laws, ***even if he did not know which particular controlled substance it was.***"  MODEL THIRD CIRCUIT JURY INSTRUCTION 6.21.841-4 (emphasis added); *see also McFadden v. United States*, 135 S. Ct. 2298 (2015); *United States v. Barbosa*, 271 F.3d 438, 457-58 (3d Cir. 2001).  Similarly, the government does not need to prove that the defendant was aware of the weight of the mixture and substance containing the controlled substance to sustain a conviction for that weight.  *United States v. Williams*, 974 F.3d 320, 363 (3d Cir. 2020).

Here, the defendant claimed he knew he was driving drugs for a drug deal, but claimed he thought the drugs were marijuana, not cocaine.  Therefore, even if the defendant's self-serving statement were believed, it would establish that he knew he was dealing a controlled substance.  This admission, in conjunction with the 16 kilograms of cocaine recovered, establishes the defendant's guilt.

Therefore, the weight of the evidence against the defendant is strong, which weighs in favor of detention.

---

[4] As established at the detention hearing, large quantities of marijuana, even if vacuum sealed, would likely emit a pungent odor.  (Tr. at 22).  Given that Berry has smoked marijuana daily since the age of 10, it is presumably an odor with which he would have been familiar.  (BR at 3).  The absence of such an odor seriously undermines his statement that he thought the box contained marijuana.

4.  ***The History and Characteristics of the Defendant Weigh in Favor of Detention***

The history and characteristics of the defendant weigh heavily in favor of detention due to the defendant's record of dishonesty, his lack of ties to the community, and the incentive to flee provided by his ICE detainer and pending immigration proceedings.

A defendant's history or record of dishonesty weighs in favor of detention.  *United States v. Odeyale*, 2024 WL 2747542, *4 (10th Cir. 2024) (noting District Court properly considered defendant's prior misstatements on immigration petitions as weighing in favor of detention because it was relevant to defendant's character and past conduct); *United States v. Angwang*, 830 Fed. Appx. 700, 701-02 (2d Cir. 2020) (noting District Court appropriately relied on "indications of [the defendant's] lack of candor with the Court even on admitted facts" when conducting BRA analysis).  The defendant provided false information about basic biographical information, such as where he lives and where he works.  This appears to be a recurring problem for the defendant, as he also has an adjudication from New Jersey for Knowingly Exhibiting a False Government Document.[5]  (BR at 4).  The fact that the defendant was unable to truthfully provide this limited information to the Pretrial Services officer(s) weighs in favor of detention.

The defendant has no ties to or history of residence in the community.  The defendant illegally entered the country four years ago, and faces removal from the country, which demonstrates a lack of ties to the community.  *Odeyale*, 2024 WL 2747542, *4.  Furthermore, the defendant has no actual ties to the Pittsburgh area.  According to him, and only him, he has lived in Braddock, PA since January 2022.  However, there is no actual evidence of that he ever lived

---

[5] It appears that this was a violation of New Jersey Code of Criminal Justice 2C:21-2.1c, which someone violates when they "knowingly exhibit[], display[], or utter[] a document or other writing which falsely purports to be a driver's license, birth certificate, or other document issued by a governmental agency and which could be used as a means of verifying a person's identity or age or any other personal identifying information."

18

there, and this absence of evidence indicates that he did not, in fact, reside in Braddock, PA.  (Tr. at 31).

The uncontested facts are that:

- In fall 2020, the defendant was released on bond in connection with his immigration case to a residence in Bradenton, FL.  (Ex. 8).

- In February 2023, the defendant was arrested in New Jersey for providing false identification documents.  (BR at 4).

- In September 2023, the defendant obtained an Ohio driver's license, with an address in Euclid, OH.  (Ex. 17).

- The defendant's wife apparently resides in Dayton, OH, over three hours from the defendant's residence according to his driver's license, and over four hours from his claimed residence in Braddock, PA.

The defendant's attempt to introduce over half a million dollars' worth of cocaine into the Pittsburgh-area is his only connection with the Western District of Pennsylvania.

The defendant also has no ties to the United States.  Eight of his nine family members reside in Jamaica.  The ninth is currently detained in Ohio in connection with immigration proceedings.  (BR. at 1-2; Ex. 18).  Therefore, the defendant not only has no ties to the Western District of Pennsylvania, but he has no family ties to the United States.

The BRA also directs the Court to consider the defendant's employment.  There is no credible evidence that the defendant has any legitimate employment.  The evidence of record demonstrates that the defendant lied about his purported employment over the last several years, and the absence of any wages reported to the Pennsylvania Bureau of Labor and Industry further confirms the lack of gainful employment.

The defendant's immigration status is also relevant because it provides a motive for the defendant to flee.  At this point, the defendant faces at least 10 years and up to life in a federal

19

prison, followed by near certain removal from the country. If the defendant were released and absconded, he would face the same consequences, less the term of imprisonment at a federal penitentiary. This provides a significant motive to flee.

Finally, the BRA directs the Court to consider whether the defendant was under court supervision in relation to another criminal matter at the time of the offense. While the government concedes that the defendant was not under any state supervision, he certainly faced additional, collateral negative consequences that should have deterred him from committing the instant conduct. The defendant is currently in the country illegally, litigating his right to stay in the country through his pending immigration decisions. Despite having the Sword of Damocles of removal hanging over his ahead, the defendant participated in large-scale, sophisticated drug trafficking. That the near certainty of removal from this country did not deter him from engaging in ongoing, large-scale drug trafficking is proof that release on bond conditions will similarly not deter him or ensure his appearance in court.

While the government acknowledges that the defendant does not have a significant criminal history, it is important to remember that "[a] defendant's criminal history is but one of the statutory factors that a district court must consider in determining whether there are conditions of release that will reasonably assure a defendant's appearance." *Odeyale*, 2024 WL 2747542, *4; *see also United States v. Epstein*, 155 F. Supp. 3d 323 (E.D. Pa., May 3, 2001) (ordering detention for white collar foreign national defendant with no criminal history and who preemptively paid restitution in full prior to initiation of criminal investigation due to lack of ties to the United States and extensive ties to Brazil, which had no extradition treaty). And though the defendant's criminal history is limited, the defendant has been engaged in large-scale drug trafficking over the last several months. Therefore, while the defendant does not have a significant history of criminal convictions, he is no novice to criminal activity.

5.  *The Nature of the Danger to the Community*

The defendant's ongoing involvement in large-scale, multi-state drug trafficking, even while facing deportation, demonstrates that his release would constitute a danger to the community.

The District Judges for the Western District of Pennsylvania have repeatedly noted that trafficking of large quantities of "very dangerous and addictive drugs like heroin and cocaine" constitute a serious risk of harm to the community and weigh in favor of detention.  *United States v. Oliver*, 2016 WL 1746853, *8 (W.D. Pa., May 3, 2016); *see also United States v. Araiza-Vega*, 2020 WL 6546136, *8 (W.D. Pa., Nov. 6, 2020) ("the Court agrees with others which have observed that drug trafficking poses a substantial risk of harm to the community, particularly the trafficking of significant quantities of dangerous, addictive drugs such as cocaine as alleged to have occurred here.").  Furthermore, while this Honorable Court observed that the defendant did not have a documented history of violence, "violence is not the only danger to the community this court must consider.  The court must also consider the danger of trafficking in illicit drugs." *United States v. Gibson*, 481 F. Supp. 2d. 419, 423 (W.D. Pa., Feb. 9, 2007).

When considering this last factor, the Court must ultimately "'predict whether defendant will engage in criminal activity if released pending trial.'"  *United States v. Bastianelli*, 2018 WL 1015269, *8 (W.D. Pa., Feb. 22, 2018) (quoting *United States v. Bratcher*, 2014 WL 1371582, *8 (W.D. Pa., Apr. 8, 2014)); *see also Gibson*, 481 F. Supp. 2d at 423 (noting Court must "make a prediction as to whether defendant is likely to traffic in illicit drugs if released pending trial").

"Many courts, including this one, have recognized that strict conditions of release, including home confinement and electronic monitoring, cannot guarantee that a defendant will no longer engage in criminal activity." *Bastianelli*, 2018 WL 1015269, *8 (citing cases); *see also Odeyale*, 2024 WL 2747542, *5 (discussing District Court's finding that "ankle monitors are not 'fool proof' and that it had 'see[n] a lot of cases where they're removed' by defendants.").  This is

particularly true when neither the Court nor pretrial services can ascertain where the defendant actually lives.  The defendant's own attorney seemed hard-pressed to explain the defendant's living arrangements:

> THE COURT: So you have an unverified address in Braddock, Pennsylvania. Is that your release plan?
>
> MR. WATSON: The release plan is to make arrangements in order for him to be released in Pennsylvania because I've been in contact with other people who are friends, who are willing to actually allow him or have him lease a place with an agreement to stay there so he can report to court.
>
> THE COURT: But in terms of today, there is no concrete release plan in terms of address, who with, whether it's suitable?
>
> MR. WATSON: At this moment, no, he does not have that in place yet.
>
> THE COURT:  Okay. Can you explain to me why he has an address in Pennsylvania and a driver's license in Ohio?
>
> MR. WATSON:  Well, he was going back and forth from Ohio and Pennsylvania in the sense that when I say "back and forth," there's a residence that's listed with regard to Pennsylvania where a family member actually had a residence in Pennsylvania. He has, you know, other connections. He has a friend, a group of friends that live in Ohio. Also, he was married in Ohio. So given his personal circumstances, he's stable. When I say he's "stable," I'm saying that he has a residence, but for someone to live or go and visit to other places and live there for periods of time, there's nothing wrong with that. That doesn't suggest that the person doesn't have a fixed residence or has anywhere to stay.

(Tr. at 40-41).  The fact that the defendant has "a group of friends that live in Ohio," that he was, at one point, "married in Ohio," and a family member "had a residence in Pennsylvania," does not provide any assurance that any conditions of release, such as location monitoring and home detention, would protect the community from the defendant's ongoing involvement in large-scale drug trafficking.  This is particularly true because at least some of his Ohio associates appear to be also involved in large-scale drug trafficking, given the evidence of the defendant's prior association with his codefendant, Roache, and the April 2024 traffic stop in which the defendant and another individual were found with over $350,000 in cash to which a narcotics dog alerted.

Not to mention the fact that the "family member" who had a residence in Pennsylvania is now currently detained in Ohio in connection with her own immigration proceedings.

Given the evidence of the defendant's ongoing involvement in large-scale drug trafficking, despite the constant threat of not only arrest but removal from the United States, the lack of any concrete evidence as to where the defendant actually has lived and would continue to live if released, and the absence of any actual record of gainful employment that would sustain the defendant should he be released, the Court can safely predict that the defendant's release would result in a significant risk to the safety of the community. This factor also weighs in favor of detention.

6. *Conclusion*

As set forth above, every single one of the 18 U.S.C. § 3142(g) factors weighs in favor of detention. The nature and circumstances of the offense have been found, by numerous members of this Court, to weigh in favor of detention. The evidence is strong, which also weighs in favor of detention. Although the defendant has a limited criminal history, that is merely one aspect of his history and characteristics. The other aspects of his history and characteristics, including his dishonesty with pretrial services, his ongoing engagement in large-scale drug trafficking, his lack of any verifiable ties to any specific location or residence, his lack of any ties to the United States, and the fact that he committed the instant offense despite facing almost certain removal from the United States, all weigh in favor of detention. As an individual engaged in ongoing, large-scale drug trafficking with little or no ties to any particular location, and no verified, legitimate employment, his release would pose a significant risk to the community.

D. **CONDITIONAL GOVERNMENT REQUEST**

In the event the Court believes, based on the current record, that release is appropriate or in the event the defendant submits a new release plan, the government respectfully requests the opportunity to reopen the hearing so that the government can present additional evidence.

Specifically, the government anticipates having additional evidence that the defendant is engaged in large-scale drug trafficking and to demonstrate his lack of ties to the community.  Furthermore, given the defendant's obvious credibility issues with respect to previously proffered release plans and the Probation Office's willingness to accept such release plans without any independent investigation, the government requests the opportunity to investigate any proposed release plans.

Should the Court determines that release is appropriate and deny the government's request to reopen the record, the government respectfully requests a 48-hour stay of the release orders so that it can file an appeal to the District Court.

WHEREFORE, the government respectfully requests that the Court grant the government's request for detention.  In the alternative, the government requests the opportunity to submit additional evidence pertinent to the 18 U.S.C. § 3142(g) factors, particularly if the Court is going to allow the defendant to submit a new release plan.  Finally, if the Court orders the release of the defendant, the government requests a 48-hour stay of the execution of that Order so the government can file an appeal.

Respectfully submitted,

ERIC G. OLSHAN
United States Attorney


*s/ Douglas C. Maloney*
DOUGLAS C. MALONEY
Assistant U.S. Attorney
PA ID No. 314082