## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Criminal No. 24-166 |
| | ) | Judge Nora Barry Fischer |
| LEON T. BERRY, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION</u>

### I.    INTRODUCTION

In this case, Defendant Leon T. Berry is charged with one count of conspiracy to possess with intent to distribute 5 kilograms or more of cocaine, in violation of 21 U.S.C. § 846 and a substantive count of possession with intent to distribute and distribution of 5 kilograms or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), and (b)(1)(B)(ii).  (Docket No. 37).  Presently before the Court are Defendant's Motion to Suppress Statements and the Government's opposition thereto.  (Docket Nos. 98; 106).  Defendant moves to suppress statements that he made to law enforcement officers during a custodial interrogation after his arrest in Cranberry Township on July 7, 2024.  (Docket No. 98). The Government counters that Defendant knowingly and voluntarily waived his *Miranda* rights prior to speaking to law enforcement officers.  (Docket No. 106).

Following receipt of the parties' initial briefs, the Court held a suppression hearing on April 14, 2025, the official transcript of which was filed on May 14, 2025.  (Docket Nos. 120; 123).  Thereafter, the parties submitted proposed findings of fact and conclusions of law on June 16, 2025, (Docket Nos. 124; 125), and responses on July 16, 2025, (Docket Nos. 128; 129).  After

careful consideration of the parties' arguments in light of the credible evidence of record, and for the following reasons, Defendant's Motion is denied.

II.    BACKGROUND

A.  *Witness Credibility and Backgrounds*

At the hearing, the Government presented the testimony of Lieutenant Matt Irvin of the Cranberry Township Police Department, FBI Special Agent John Balish, and FBI Task Force Officer and Indiana Township Police Detective Robert Thompson and introduced two exhibits, a Report of Interview and a fully executed Advice of Rights form.  (Docket No. 123 at 10-109).  For his case, Defendant testified but did not present any exhibits.  (*Id*. at 111-134).  As is noted below, the testimony of the witnesses conflicted in many respects.  Having carefully reviewed the evidence of record and evaluated the demeanor of the witnesses, it is this Court's opinion that the law enforcement officers offered credible testimony regarding the events in question, as their versions were largely corroborated by each other's testimony and the exhibits which were presented. *See United States v. Garcia,* 521 F.App'x 71, 73 (3d Cir. 2013) (quoting *Anderson v. City of Bessemer*, 470 U.S. 564, 574 (1985)) ("'[w]hen findings are based on determinations regarding the credibility of witnesses ... for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said.' ").  Although the Court accepts some portions of Defendant's testimony, particularly concerning his background, the Court does not credit many of his assertions which contradicted the testimony of the officers.  *See id.*  His testimony was also inconsistent and argumentative, at times, undermining his credibility.

Each of the Government's witnesses testified that they were college graduates and experienced law enforcement officers.  (Docket No. 123 at 28-29; 32; 74-75; 80; 105).  To that

end, Special Agent Balish, who served as lead investigator for the below described operation, has been with the FBI since 2016, and received extensive training on, among other topics, narcotics investigations, suspect interviews, interrogations, *Miranda* warnings and the FBI Advice of Rights form. (*Id*. at 32-33). Detective Thompson has been a law enforcement officer with Indiana Township for more than 16 years and a member of the FBI Task Force for at least three years, where he has been involved in at least a dozen interviews of suspects akin to the instant matter. (*Id*. at 80; 105). He assisted Special Agent Balish during the events of July 7, 2024. (*Id*. at 83; 87; 98-99). Both Special Agent Balish and Detective Thompson demonstrated a thorough understanding of *Miranda* rights and waivers of same upon questioning at the hearing. Lieutenant Irvin has been in law enforcement since 1999, serving in several departments, including the past 22 years with Cranberry Township. (*Id*. at 28-29). He is not a member of the FBI Task Force but provided a support role for the FBI's operation which took place in his department's jurisdiction. (*Id*. at 23-24).

Defendant is 35 years old. (Docket No. 123 at 45; 111). He is a native of Jamaica. (*Id*. at 111-112). He has been in the United States for at least five years but does not have legal status in this country. (*Id*.; Docket No. 81 at 2). He attended high school but did not graduate and has not served in the military. (Docket No. 123 at 131). He worked in construction doing drywall and finishing. (*Id*.). He can read, speak, and understand English, although he has a Jamaican accent. (*Id*. at 45-46; 120). He does not wear glasses. (*Id*. at 132). No evidence was presented indicating that he was under the influence of drugs or alcohol or suffering from any mental health ailments at the time of the events in question. (*See generally* Docket No. 123).

Prior to testifying himself, Defendant observed the Government's witnesses at the suppression hearing. From the Court's view, when Defendant took the stand, he unsuccessfully

attempted to tailor his testimony to fit the legal theories asserted on his behalf and had significant reasons to do so as he faces a mandatory minimum penalty of 10 years' incarceration and up to a life term as well as possible deportation if he is convicted of the charges. (*Id*. at 4-5; Docket No. 81 at 2).

      *B. Buy-Bust Operation*

Returning to the events in question, the FBI set up what was described as a buy-bust operation where a confidential informant was used to purchase narcotics from an Ohio-based source at the Meeder Flats Apartments in Cranberry Township on Sunday, July 7, 2024. (Docket No. 123 at 47; 67). Special Agent Balish contacted Lieutenant Irvin the day before and gave him general details of the plan. (*Id*. at 19). The Cranberry Township Police Department agreed that uniformed officers in marked vehicles would provide security and additional support and that any suspects could be detained at the police station upon their arrests. (*Id*. at 11; 19; 22). Pennsylvania State Police also assisted and at least one state Trooper in a marked vehicle was involved. (*Id*. at 22).

The Cranberry Township Police Station is located across the street and approximately 200 yards away from the apartment complex. (Docket No. 123 at 11). The station has a sally port with a garage and an adjacent room used for processing arrestees. (*Id*. at 12-13). There are two holding cells and several secured interview rooms which are set up with closed circuit video monitored by officers through computers in their offices. (*Id*. at 12-14; 27). Some of the interview rooms are located near the holding cells and others are by the lobby area. (*Id*. at 27). In addition to the surveillance video, the interview rooms are outfitted with audio recording technology which can be enabled by pushing a button within the room. (*Id*. at 14). The video feed is recorded and stored for approximately 60 days; at which time the system overwrites the older footage to save data

space. (*Id*. at 17). It is uncontested that the audio functions were not used on the date in question. Lt. Irvin explained that no video was recovered from the station's system because the request by law enforcement was made a few weeks before the hearing which was beyond the 60-day timeframe. (*Id*. at 17).

### C. Defendant's Arrest and Processing

Three individuals, including Defendant and co-defendant Nicoy Antony Phang Roache, were arrested in the Meeder Flats parking lot on the morning of July 7, 2024. (Docket No. 123 at 33-34). Law enforcement officers observed Defendant as the driver of a vehicle containing a cardboard box that was ultimately transferred to a confidential informant in the parking lot. (*Id*. at 67). The box was seized and contained a large quantity of suspected narcotics. (*Id*.). Special Agent Balish and Det. Thompson were on scene as part of the surveillance team and involved in the arrests. (*Id*. at 33). They were both dressed in civilian clothes. (*Id*. at 76; 106). Lt. Irvin, another officer from Cranberry Township and a State Trooper arrived on scene shortly after the arrests and separately drove the three arrestees from the apartment complex to the nearby police station for processing. (*Id*. at 22). They were all in uniform and driving marked vehicles. (*Id*.). Special Agent Balish believed that Defendant was transported by one of the marked Cranberry Township vehicles. (*Id*. at 33-34). Lt. Irvin testified that he did not recall which of the individuals he personally drove across the street but admitted that he was not directed to give the arrestees *Miranda* warnings and did not provide them to the individual that he transported. (*Id*. at 12; 22). The arrestees were then brought through the sally port at the station, searched, processed, and separately placed in one of the holding cells or interview rooms. (*Id*. at 12-13).

Lt. Irvin retreated to his nearby office and was tasked with monitoring the video surveillance feeds from the holding cells and interview rooms and assisting the arrestees, as

needed, to use the restroom, provide water and the like.  (Docket No. 123 at 22-23).  Although the video surveillance system Lt. Irvin can observe on his computer does not contain an audio feed, he explained that the station has a drop ceiling, and the cells are and interview rooms are near his office such that he could often hear individuals if they are speaking loudly and/or causing a commotion in those areas.  (*Id*. at 15-16).

Special Agent Balish stated that he went directly to the police station a few minutes after the arrests.  (Docket No. 123 at 34).  He estimated that approximately 45 minutes to an hour later, he encountered Defendant in the processing area and asked if he was interested in speaking to law enforcement.  (*Id*. at 34-35).  Det. Thompson was with him at the time.  (*Id*.).  Defendant responded that he needed a few minutes to consider his situation and collect his thoughts.  (*Id*.).  Special Agent Balish agreed, and the officers departed the area.  (*Id*.).

### D.  Initial Interview Attempt

After approximately five minutes, Special Agent Balish and Det. Thompson returned to the cell block to follow-up with Defendant.  (Docket No. 123 at 35-36).  At that time, Defendant advised that he wished to speak to the investigators, and he was escorted to an interview room.  (*Id*.).  The three of them sat at a table.  (*Id*. at 76; 106).  The officers remained in their civilian clothes and their firearms were holstered.  (*Id*. at 39; 76; 106).  The officers are not physically imposing figures as both are average height and weight.  (*Id*. at 76 (Special Agent Balish is 6 feet tall and weighs 212 pounds); at 106 (Det. Thompson is 5 foot, 8 inches tall and weighs 165 pounds)).  There is no evidence that Defendant was restrained in handcuffs or shackles.

Special Agent Balish testified that he had conducted hundreds of such interviews with suspects where he is seeking additional information to further an investigation and that his practice is to not record these interactions for the safety of the individual.  (Docket No. 123 at 54-55; 69-

70; 73).  He followed the same practice here and did not record the interviews with Defendant. (*Id*. at 54-55).

As noted, the Court does not credit Defendant's version of the events as the agents provided a consistent account and were more credible as witnesses.  Indeed, as the Government points out, despite his denials that he was read his rights by the officers, Defendant started to admit that he was read his rights before being redirected by counsel.  (*See* Docket No. 123 at 115 ("Q. So was he asking these questions before reading off the form or the Miranda rights? A. Yeah. At first, he start talking to me about my rights and stuff –")).   He made additional references to the warnings during his testimony.  (*Id*. at 116 ("You guys said, If I said something to you guys, it can be used against me in the courtroom. So I prefer do it in front of a lawyer because I don't understand what you guys telling me about drugs."); 120-21 ("Q. Now, you testified that you were confused because the agents told you that whatever you said could be used against you in court; correct? A. Yes, the agents told me that.")).  Defendant also claimed that he made explicit demands for a lawyer to the officers, but when pressed for specifics, he testified that he told them "Why you're going to say anything I said to you can be used against me in court but you don't want to give me a lawyer?" (Docket No. 123 at 119).  Although the Court does not accept Defendant's testimony that he told the agents "you don't want to give me a lawyer," it is apparent from all of the witnesses that he was asking the agents questions and was unresponsive to their inquiries about the Advice of Rights form which ultimately led to the termination of the interview.

Per the officers' credible testimony, Special Agent Balish took the lead during the interview and briefly described the situation to Defendant, i.e., they were investigating the drug trafficking activities of Defendant and others, they had seized a large quantity of narcotics in the parking lot of the apartment complex which led to his arrest, and that he was facing significant

penalties including up to a life term of incarceration.  (Docket No. 123 at 35-36).  The meeting was conversational, and the officers did not make any promises to Defendant and did not threaten or yell at him.  (*Id*. at 36; 83).  Detective Thompson did not speak to Defendant, other than providing him a water.  (*Id*. at 83; 87; 98-99). Special Agent Balish read Defendant his *Miranda* rights, as stated on the Advice of Rights Form.  (*Id*. at 35-36; 55-57; 81).  Defendant did not sign the form at that time.  (*Id*. at 38).  Special Agent Balish ended the meeting because Defendant made equivocal statements about whether he should have a lawyer present but could not recall the specific words that he used.  (*Id*. at 36-38; 55-57).  Detective Thompson added that he remembered Defendant making statements that it was "just marijuana" in the box and that he appeared confused about the questions regarding other drugs but understood his rights. (*Id*. at 102; 108). Special Agent Balish terminated the interview because he believed that Defendant's responses had put the agents in a "gray area," as they understood their responsibility to cease questioning of a suspect who had unequivocally invoked his right to counsel. (*Id*. at 38).  While Defendant did not do so, he also was not answering the questions posed to him regarding whether he would waive his rights and sign the Advice of Rights form.   (*Id*. at 38).

### E.  Defendant's Request to Speak to Agents

As the interview ended, the officers escorted Defendant back to the holding cell.  (Docket No. 123 at 84).  The witnesses' testimony also conflicted regarding the subsequent events and the Court once again adopts the versions provided by the Government's credible witnesses.  *See Garcia,* 521 F.App'x at 73. In this regard, the Court rejects Defendant's testimony that he had a solo exchange with Det. Thompson where he stated he wanted a lawyer and Det. Thompson allegedly told him that his supervisor could help him if he spoke to investigators. (*See* Docket No. 123 at 113-115).   The Court believes Det. Thompson's credible denial that he had any

conversations with Defendant beyond providing a bottle of water, as Special Agent Balish was the lead investigator, and he was in a support role. (*Id*. at 83; 87; 98-99).

The Court likewise does not adopt Defendant's assertions that he never spoke to Lt. Irvin. (*See* Docket No. 123 at 121). Rather, the Court credits the testimony of Lt. Irvin, who explained that he either heard Defendant or observed him motioning for his attention over the video feed and proceeded to the cell block to check on him, at which time Defendant stated that he wanted to speak to the agents. (*Id*. at 15-16; 23). He did not request a lawyer at that time. (*Id*. at 23). Lt. Irvin then alerted Special Agent Balish and Det. Thompson that Defendant wanted to talk, they returned to the cell block where Defendant confirmed same, and then escorted him to a conference room in the lobby area of the station. (*Id*. at 16; 23; 40-41; 59; 84-85; 93). These facts were corroborated by Special Agent Balish and Det. Thompson, who testified similarly. (*Id*. at 40; 59; 84; 93).

### F. *Miranda Waiver and Interview*

With respect to the later interview in the lobby interview room, the Court again credits the evidence provided by law enforcement. *See Garcia,* 521 F.App'x at 73. Hence, the Court disregards Defendant's claims that he: was immediately subject to questioning by the officers, including being shown photos on a laptop by an unidentified female agent; was not provided with *Miranda* warnings until the end of the interview; and did not sign the Advice of Rights form. (*See* Docket No. 123 at 119-121). Instead, the Court accepts the credible testimony from Special Agent Balish and Det. Thompson that Defendant was read his *Miranda* rights at the outset of the interview, they provided him with the form, witnessed him sign it and signed it themselves. (*Id*. at 41-43; 86-87; Ex. 2). They believed that Defendant understood his rights and voluntarily waived them, as is seen in Government Exhibit 1.

Exhibit 1

| FD-395 Revised 11-05-2002 | FEDERAL BUREAU OF INVESTIGATION **ADVICE OF RIGHTS** |
|---|---|

**LOCATION**

Place: Cranbury PD

Date: 7/7/24

Time: 2:23P

**YOUR RIGHTS**

Before we ask you any questions, you must understand your rights.

You have the right to remain silent.

Anything you say can be used against you in court.

You have the right to talk to a lawyer for advice before we ask you any questions.

You have the right to have a lawyer with you during questioning.

If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.

**CONSENT**

I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present.

Signed:

**WITNESS**

Witness:

Witness:

Time: 2:23p

(Govt. Ex. 1). Special Agent Balish then proceeded to question Defendant about the incident leading to his arrest and explained that Defendant did not request a lawyer during the interview. (*Id*. at 41; 43-44; 87-88; 98-99). The agents were not asked if they were joined by a female officer with a laptop as Defendant suggested but Special Agent Balish confirmed that other officers were in and out of the room after the waiver was signed and the interview was taking place. (*Id*. at 41). There is no credible evidence that Defendant was coerced or forced into giving the interview; the officers did not yell at him; and did not make him any promises. (*Id*. at 41; 43-44; 87-88; 98-99).

Overall, the Court finds that the officers' testimony and version of events simply makes more sense than the story told by Defendant, particularly as the officers had already terminated the

initial interview when Defendant asked wavering questions upon being advised of his *Miranda* warnings and provided with the Advice of Rights form.  *See* § II.D., *supra*.  There is no apparent reason why the officers would have departed from that practice during the second interview if he had refused to sign the form, as he suggested.  The Court also declines to draw any adverse inference against the Government for the lack of the recording of the interviews and accepts the rationale provided by Special Agent Balish for that decision.  (*See* Docket No. 123 at 54-55; 69-70; 73).

Although the substance of the interview was not discussed at length during the hearing, Defendant made inconsistent statements concerning various issues and changed his testimony about other things which lend further support to the Court's adverse credibility findings.  For example, Defendant testified on direct that the officers showed him a picture of an individual during the interview, and he told them that he saw the individual at a restaurant.  (Docket No. 123 at 117-118 ("Q. When you said 'he,' who? A. Officer Balish, said where did I meet the person. And then I told him, like, I saw the person at the restaurant.")).  When he was later asked on cross-examination if he had been to the restaurant the day before his arrest, he claimed he could not have been at the restaurant because it was closed on Sundays and continued that he was at a backyard barbeque instead.  (*Id*. at 125).  The prosecutor then pointed out that Defendant had been arrested on Sunday, making the day before Saturday, but Defendant avoided the discrepancy with the restaurant's schedule and described the barbeque that he attended on Saturday.  (*Id*. at 125; 132). The Court followed up and asked Defendant about who he saw at a restaurant, and he denied it, emphatically stating, "I don't see no one at no restaurant, Your Honor."  (*Id*. at 132).

In addition, Defendant admitted that he drove the box to Pittsburgh at the request of "Brown Man," but refuted that he was paid $1,000 to do so and stated that he brought the box here as a

favor for someone because he was returning to work in this area. (Docket No. 123 at 126-127). He denied telling the agents that he thought he was transporting marijuana; claimed that his comments were only about a "spliff" containing marijuana that was found in his car; and stated that he did not know what was in the box. (*Id*. at 127; 133). He initially asserted that he was not interviewed by a Pretrial Services Officer but eventually conceded same. He then sparred with the prosecutor over the accuracy of the information he provided during that interview, including whether he really lived at the address in Pittsburgh or at the address in Euclid, Ohio noted on his Ohio driver's license; and if he owned a business called Elite Construction which was registered in Pennsylvania, despite the investigators finding no record of such business. (*Id*. at 122-123; 127-131). His argumentative tone and demeanor during these exchanges further undermine his credibility with the Court. *See Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 575 (1985) ("[O]nly the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said.").

### G. Subsequent Events and Procedural History

On the day after the arrest, Defendant was charged by a criminal complaint, supported by an affidavit of probable cause sworn by Special Agent Balish and brought into Pittsburgh for an initial appearance at the Joseph F. Weis, Jr. U.S. Courthouse. (Docket Nos. 1; 10-13). He was appointed counsel and waived a preliminary hearing and detention hearing. (Docket Nos. 10-13). He has been in federal custody since that time and subject to an immigration detainer which has been lodged against him. (Docket No. 81 at 2). Approximately five days after the arrests, Special Agent Balish reviewed his notes and prepared the following Report of Interview:

FD-302 (Rev. 5-8-10)

**FEDERAL BUREAU OF INVESTIGATION** 

# Exhibit 2

Date of entry _____07/12/2024_____

On July 7, 2024, LEON TAFARIE ORLANDO BERRY (BERRY), date of birth, ████████ was detained during a law enforcement operation in the vicinity of ████████ located at ████, Cranberry, PA 16066 (APARTMENT). BERRY was transported to Cranberry Township Police Department (CTPD) pending further investigation.

After being detained at CTPD, BERRY was asked if he wanted to speak with investigators about the events that had occurred at the APARTMENT. BERRY indicated that he needed a few minutes to process his current situation. After providing BERRY with approximately five minutes BERRY agreed to speak with investigators. BERRY was then escorted to an interview room.

Prior to questioning, Special Agent (SA) John Balish in the presence of Task Force Officer (TFO) Robert Thompson read BERRY his Miranda rights with the FD-395 "Advice of Rights" form. After reading BERRY his rights he made multiple wavering statements about the presence of a lawyer during questioning. Although it was clear that BERRY did not specifically request a lawyer be present during questioning SA Balish and TFO Thompson decided to terminate the interview in an abundance of caution. BERRY was returned to a holding cell at CTPD.

After approximately an hour SA Balish and TFO Thompson were in the holding area of CTPD. BERRY indicated to investigators that he wanted to speak. BERRY was then escorted to an interview room.

Prior to questioning, Special Agent (SA) John Balish in the presence of Task Force Officer (TFO) Robert Thompson again read BERRY his Miranda rights with the FD-395 "Advice of Rights" form. After reading BERRY his rights BERRY made made it clear that he understood his rights and agreed to speak with SA Balish and TFO Thompson. BERRY confirmed his intention by signing the FD-395.

After being advised of the identity of the interviewing Agents (SA Balish/TFO Thompson) and the nature of the interview, BERRY provided the following information:

Investigation on  07/07/2024  at  Cranberry, Pennsylvania, United States (In Person)

File #  281C-PG-3897603                                Date drafted  07/12/2024

by  John Robert Balish

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

(Govt. Ex. 2; Docket No. 123 at 44).

The grand jury returned an Indictment containing the present charges on July 30, 2024. (Docket No. 37).  Thereafter, a detention hearing was held on August 21, 2024, the official transcript of which was filed on August 22, 2024.  (Docket Nos. 71; 72).  The parties submitted supplemental briefs the following week and U.S. Magistrate Judge Christopher Brown ultimately

ordered that Defendant be detained pending trial in a Memorandum Opinion dated September 13, 2024. (Docket No. 81). Defendant did not appeal or challenge this decision.

The instant motion was filed on January 6, 2025, and the Government submitted its Response on January 27, 2025. (Docket Nos. 98; 106). Defendant declined to file a Reply. The Court then conducted a hearing on April 14, 2025, and received the transcript of those proceedings on May 14, 2025, proposed findings of fact and conclusions of law from the parties on June 16, 2025, and responses on July 16, 2025. (Docket Nos. 123-129). As the matter is fully briefed, it is now ripe for disposition.

III.    LEGAL STANDARDS

It is well-settled that, at a hearing on a motion to suppress, "the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge." *United States v. Burrus*, 402 F. Supp. 3d 116, 122 (W.D. Pa. 2019) (quoting *United States v. Richardson*, 501 F. Supp. 2d 724, 734 (W.D. Pa. 2007)). "'[H]earsay testimony is admissible at suppression hearings ... and should be considered by a district court' if reliable." *United States v. Montalvo-Flores*, 81 F.4th 339, 344 (3d Cir. 2023) (quoting *United States v. Miramonted*, 365 F.3d 902, 904 (10th Cir. 2004)) (further citation omitted).

> "As a general rule, the burden of proof is on the defendant who seeks to suppress evidence. However, once the defendant has established a basis for his motion ... the burden shifts to the government." *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995) (citations omitted). "A defendant 'satisfies that burden if he alleges that he was subjected to custodial questioning without the benefit of *Miranda* warnings,' at which point the government must 'prove by a preponderance of the evidence that there was no custodial interrogation implicating *Miranda*, there was some exception to the *Miranda* rule, or ... [the defendant] ... was properly *Mirandized* and waived his rights.'" *United States v. Valenta*, Crim. No. 15-161, 2017 WL 2131375, at *4 (W.D. Pa. May 17, 2017) (quoting *United*

*States v. Tudoran*, 476 F. Supp. 2d 205, 216 (N.D.N.Y. 2007) (citation omitted)).

*United States v. Pride*, Cr. No. 16-68, 2019 WL 2866843, at *5 (W.D. Pa. July 3, 2019).

IV.    DISCUSSION

As noted above, Defendant moves to suppress his statements to law enforcement and alleges that he unequivocally requested counsel; did not waive his *Miranda* rights; and only made statements to law enforcement officers due to coercion and duress. (Docket Nos. 98; 124; 129). The Government concedes that Defendant was subject to a custodial interrogation as he was interviewed while he was detained at the Cranberry Township Police Department and that he was entitled to *Miranda* warnings prior to such questioning. (Docket Nos. 106; 125; 128). However, the Government contends that Defendant made wavering statements about counsel, at which point they terminated the interview and Defendant initiated further questioning by requesting that the agents return to interview him. (*Id.*). The Government further maintains that Defendant was only questioned after he executed a written *Miranda* waiver that the law enforcement officers fully explained to him. (*Id.*).

The legal principles at issue in this case are well established. As the Third Circuit recently recounted:

> The Fifth Amendment provides that "No person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. To safeguard this right, the Supreme Court in Miranda "imposed certain obligations on police in custodial interrogations, in order to dissipate the 'compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely.'" *United States v. Velasquez*, 885 F.2d 1076, 1084 (3d Cir. 1989) (quoting *Miranda*, 384 U.S. at 467, 86 S.Ct. 1602). The familiar *Miranda* warnings require police to "inform the suspect of his right to remain silent and his right to have counsel present during interrogation, as well as their intent to use his statements to secure a conviction." *Id.* Police must

also "cease the interrogation if at any point the suspect indicates that he wishes to remain silent or that he wants an attorney." *Id.*

In *Edwards*, the Supreme Court established a bright-line rule for suspects who have invoked the right to counsel: "an accused person in custody who has invoked his desire not to speak until he has conferred with counsel 'is not subject to further interrogation ... until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.'" *Id.* (quoting *Edwards*, 451 U.S. at 484-85, 101 S.Ct. 1880). If a suspect who has invoked the right to counsel but not yet met with counsel initiates discussion with the authorities, further interrogation can take place. *Id.* at 1084, 1087. Post-invocation statements made during that interrogation may then be admissible against the suspect at trial if the suspect knowingly and voluntarily waives the right to counsel and the right to remain silent. *Id.*; *see also Oregon v. Bradshaw*, 462 U.S. 1039, 1045-46, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983) (plurality opinion); *Edwards*, 451 U.S. at 486 n.9, 101 S.Ct. 1880.

…

In sum, then, a suspect who has invoked the right to counsel and has not yet met with counsel is generally not subject to further interrogation unless the suspect initiates discussion with law enforcement. Once there has been an initiation, further interrogation can take place, and the suspect's statements may be admissible against him at trial if he validly waives the right to remain silent and the right to counsel. *See Velasquez*, 885 F.2d at 1084-89.

*United States v. Rought*, 11 F.4th 178, 186–87 (3d Cir. 2021).

Having carefully considered these standards and the credibly established facts of record, the Court finds that the Government proved by a preponderance of the evidence that Defendant: 1) did not unequivocally request counsel during the initial interview; 2) re-initiated communication with the officers and indicated that he wished to speak to them; and 3) knowingly and voluntarily waived his *Miranda* rights prior to being interviewed.   *See id.*  While the Court's decisions on these issues necessarily flow from its credibility determinations explained above, the Court briefly addresses the parties' arguments, in turn.

*A. Defendant Did Not Unambiguously Invoke the Right to Counsel*

At the outset, Defendant suggests that he "unequivocally invoked his right to counsel on two separate occasions, stating that he wanted to speak to a lawyer before proceeding further with questioning," in the initial interview. (Docket No. 98). It is Defendant's burden to prove that he clearly invoked his right to counsel. *See United States v. Green*, No. CR 19-84, 2022 WL 574864, at *7 (W.D. Pa. Feb. 25, 2022) ("The burden of persuasion on the discrete issue whether defendant clearly invoked his Miranda rights is on the defendant."). An accused's invocation of his or her right to counsel must be "unambiguous." *Davis v. United States*, 512 U.S. 452, 459 (1994). If "an accused makes a statement concerning the right to counsel 'that is ambiguous or equivocal[,]' ... the police are not required to end the interrogation or ask questions to clarify whether the accused wants to invoke his or her *Miranda* rights." *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010) (quoting *Davis*, 512 U.S. at 461-62). The Supreme Court has explained that:

> [t]here is good reason to require an accused who wants to invoke his or her right to remain silent to do so unambiguously. A requirement of an unambiguous invocation of *Miranda* rights results in an objective inquiry that "avoid[s] difficulties of proof and ... provide[s] guidance to officers" on how to proceed in the face of ambiguity. *Davis*, 512 U.S., at 458-459, 114 S.Ct. 2350. If an ambiguous act, omission, or statement could require police to end the interrogation, police would be required to make difficult decisions about an accused's unclear intent and face the consequence of suppression "if they guess wrong." *Id*., at 461, 114 S.Ct. 2350. Suppression of a voluntary confession in these circumstances would place a significant burden on society's interest in prosecuting criminal activity. *See id*., at 459–461, 114 S.Ct. 2350; *Moran v. Burbine*, 475 U.S. 412, 427, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986).

*Berghuis*, 560 U.S. at 381-82.

Following such precedent, Courts have recognized that an accused's statements or questions about having the right to an attorney do not suffice to clearly invoke the right to counsel.

*See e.g., Davis*, 512 U.S. at 459 (holding that the defendant's statement "maybe I should talk to a lawyer" was insufficient to invoke the right to counsel); *United States v. Richardson*, 265 F. App'x 52, 55 (3d Cir. 2008) (holding defendant's question "when can I get a public defender" was insufficient to invoke the accused's right to counsel); *United States v. Columna*, 2024 WL 4182588, at *5 (3d Cir. Sept. 13, 2024) (holding "I have the right to an attorney, right?" was not an invocation of the right to counsel); *Cf. Rought*, 11 F.4th at 190 (accused's statement that "I don't really want to talk about that aspect without my lawyer. ... That's a serious situation. I mean, they're trying to roof me" was not an unambiguous request for counsel for all purposes). Similarly, the cases teach that an accused's inquiries to an officer asking whether he or she should have an attorney present for questioning does not constitute an unequivocal invocation of the right to counsel. *See e.g.*, *United States v. Wysinger*, 683 F.3d 784, 794-95 (7th Cir. 2012) (concluding that the statement "[d]o I need a lawyer before we start talking?" is not an unambiguous invocation); *Diaz v. Senkowski*, 76 F.3d 61, 63-64 (2d Cir. 1996) ("I think I want a lawyer" and "Do you think I need a lawyer?" are not clear invocations of the right to counsel). If the accused does not clearly invoke the right to counsel, law enforcement officers are not required to cease questioning of the suspect. *Berghuis*, 560 U.S. at 381.

Here, the Court credits the testimony of Special Agent Balish and Det. Thompson and finds that Defendant did not clearly and unequivocally invoke his right to counsel during the initial interview. Rather, after he was read his *Miranda* rights by Special Agent Balish, Defendant made wavering statements about his right to an attorney which were insufficient to rise to the level of a clear invocation of the right to counsel. (Docket No. 123 at 36-38; 55-57; 102; 108). Although the officers were not required to cease questioning at that time, Special Agent Balish felt that Defendant's responses left them in a "gray area" and terminated the interview out of an abundance

of caution.  (*Id.* at 38).  Defendant's assertions that he explicitly requested counsel were not credible before this Court and not supported by any other evidence of record.  *See* § II.D., *supra*. All told, the Court holds that the Government demonstrated by a preponderance of the credible evidence that Defendant did not clearly invoke his right to counsel during the initial interview.  *See Berghuis*, 560 U.S. at 381.  Hence, Defendant's motion to suppress is denied to the extent that he claims his rights were violated in this initial interview.

### B. Defendant Re-Initiated Contact with Officers

Defendant next claims that he did not re-initiate contact with the officers and was prompted by Det. Thompson to sit for the second interview.  (Docket Nos. 98; 124; 129).  The Government maintains that Defendant reached out to law enforcement and indicated his desire to speak to them. (Docket Nos. 106; 125; 128).  In this Court's estimation, Defendant's position is both legally and factually untenable.

As a legal matter,

> a suspect who has invoked the right to counsel and has not yet met with counsel is generally not subject to further interrogation unless the suspect initiates discussion with law enforcement. Once there has been an initiation, further interrogation can take place, and the suspect's statements may be admissible against him at trial if he validly waives the right to remain silent and the right to counsel.

*Rought*, 11 F.4th at 187.  Further, "'an initiation occurs when a suspect initiates a conversation evincing a willingness and a desire for a generalized discussion about the investigation.'" *Id.* (quoting *Velasquez*, 885 F.2d at 1085).  Thus, in circumstances such as these, where Defendant did not clearly invoke the right to counsel during the initial interview, the officers were not required to cease questioning him and were able to re-approach Defendant themselves without violating the initiation principle.  *See Berghuis*, 560 U.S. at 381.

With that said, as a factual matter, the Court has also rejected Defendant's testimony that he had a solo conversation with Det. Thompson while he was in the holding cell and credited Det. Thompson's denial that any such conversation took place as well as Lt. Irvin's testimony that he was signaled by Defendant and told that he wanted to speak to the agents. *See* § II.E., *supra*. Both Special Agent Balish and Det. Thompson testified similarly, corroborating Lt. Irvin's version of the events. *See id.* From those facts, the Court alternatively holds that the Government demonstrated by a preponderance of the evidence that Defendant re-initiated contact with the officers and showed a willingness to speak with them in the second interview. *See Rought*, 11 F.4th at 187. Thus, Defendant's motion is denied insofar as he asserts that law enforcement inappropriately re-initiated contact with him after invoking his right to counsel.

### C.  Defendant Knowingly and Voluntarily Waived His Rights

The Court's last inquiry is whether Defendant knowingly, voluntarily and intelligently waived his *Miranda* rights during the second interview. Defendant argues that the Court should accept his testimony that he was immediately subject to questioning without being given *Miranda* warnings, denies signing the Advice of Rights form, and claims that he was coerced into questioning based on promises of leniency regarding the potential penalties. (Docket Nos. 98; 124; 129). The Government asks that the Court adopt the testimony of the officers showing that Defendant waived *Miranda* rights and was not coerced into speaking with them. (Docket Nos. 106; 125; 128).

The law is well settled that:

> [a] waiver of the *Miranda* rights must be voluntary, knowing, and intelligent considering the totality of the circumstances. [*Velasquez*, 885 F.2d at 1086 (citing *Miranda*, 384 U.S. at 444, 86 S.Ct. 1602)]. A waiver is voluntary if "it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Colorado v. Spring*, 479 U.S. 564, 573, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987)

(quoting *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986)). In the voluntariness inquiry, "[a] suspect's background and experience, including prior dealings with the criminal justice system, should be taken into account." *United States v. Jacobs*, 431 F.3d 99, 108 (3d Cir. 2005). A waiver is knowing and intelligent if "made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Spring*, 479 U.S. at 573, 107 S.Ct. 851 (quoting *Burbine*, 475 U.S. at 421, 106 S.Ct. 1135); *see also Berghuis v. Thompkins*, 560 U.S. 370, 382-83, 130 S.Ct. 2250, 176 L.Ed.2d 1098 (2010). If the Government "shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." *Berghuis*, 560 U.S. at 384, 130 S.Ct. 2250.

*Rought*, 11 F.4th at 187.

Here, the totality of the circumstances persuades the Court that the Government proved by a preponderance of the evidence that Defendant knowingly, intelligently, and voluntarily waived his right to counsel. *See id.* As is explained above, the Court credits the testimony of the officers that prior to engaging in any questioning during this second interview, Special Agent Balish reviewed the *Miranda* warnings and Advice of Rights form with Defendant, the officers watched him sign the form, and they signed it as well. *See* § II.F., *supra*. According to their credible testimony, this was the second time that Defendant had been read his rights on the date in question. *See* § II.D., *supra*. The experienced officers explained that they believed Defendant understood his rights and knowingly waived them before he was questioned about the events leading to his arrest. *See* § II.F., *supra*. The Court did not find Defendant's testimony denying that he was read his rights and claiming that he did not sign the form to be credible, as is explained above. *See e.g., United States v. Moss*, No. 23-2638, 2024 WL 4678047, at *2 (3d Cir. Nov. 5, 2024) ("The problem for Moss is that the District Court found that the agents were credible and he was not.").

The evidence presented also showed that there was nothing in Defendant's background to indicate that he was unable to understand the *Miranda* warnings and could not validly waive his

rights to same.  To that end, Defendant is 35 years old, reads, writes, and speaks English, has some high school education, and there was no indication that he was under the influence of alcohol or drugs, nor suffering from any mental health ailments when he met with the officers.  (Docket No. 123 at 45-46; 111-112; 120; 132).  Although Defendant has a Jamaican accent, he does not require an interpreter and he showed a sufficient ability to communicate in English while testifying at the hearing.

The totality of the circumstances further indicate that Defendant's will was not overborne by the officers during the questioning and his speaking to them was undoubtedly voluntary.  *See Velasquez*, 885 F.2d at 1084.  To reiterate, while Defendant was in custody at the time, the setting of the interview was not unduly coercive as the average-sized officers were in plain clothes, with their firearms holstered, and they were seated at a table in an interview room across from Defendant, who was not restrained by handcuffs or shackles.  (Docket No. 123 at 39; 76; 106).  The meeting was conversational in tone and there is no credible evidence that the officers yelled at or threatened Defendant to get him to talk to them.   (*Id*. at 41; 43-44; 87-88; 98-99).

Finally, the Court accepts the officers' testimony that Special Agent Balish did not make Defendant any promises and given same, his position that the potential penalties were referenced is not legally sufficient to render the waiver of his *Miranda* rights involuntary.  (*See* Docket No. 123 at 36; 43; 88).  Indeed, numerous courts have found that general claims that an officer could help a suspect regarding potential penalties if he provided information are not alone sufficient to show that a confession was involuntary.  *See e.g.*, *United States v. McKenzie*, No. 2:20-CR-314, 2022 WL 16958658, at *7 (W.D. Pa. Nov. 16, 2022) ("While Detective DeFelice's questions soliciting cooperation from Mr. McKenzie in exchange for leniency bear on the need for *Miranda* warnings, such statements do not necessarily spoil the voluntariness of the subsequent statements"

[…]  "This is especially true where, as here, the statements suggesting leniency are not misrepresentative, are limited in scope, and do not make guarantees.") (Ranjan, J.); *United States v. Green*, Crim. No. 19-84, 2022 WL 574864, at *10 (W.D. Pa. Feb. 25, 2022) (Conti, J.) ("The facts that Green likely faced criminal charges and detention if he refused to cooperate and that Orlando presented Green with unpleasant options does not make his waiver of rights non-voluntary."); *United States v. Falciglia*, 421 F. App'x 146, 147 (3d Cir. 2008) ("Our sister courts of appeals are uniform in holding that an officer may indicate that the defendant's statements could bring about leniency without violating *Miranda*.").  Rather, the Court must consider the totality of the circumstances to determine whether the statement was voluntary and having done so here, the Court concludes that Defendant voluntarily waived his right to counsel before speaking to the agents.  *See Rought*, 11 F.4th at 187.  Simply put, there is no credible basis to find that Defendant's statements were involuntary in this case.  *See id.*

For all of these reasons, the totality of the circumstances demonstrate that Defendant knowingly, voluntarily and intelligently waived his *Miranda* rights before providing information to the officers during the second interview.  *See Rought*, 11 F.4th at 187.  Accordingly, his motion to suppress must be denied to the extent that he challenges the waiver.

V.    CONCLUSION

Based on the foregoing, Defendant's Motion to Suppress Statements [98] is DENIED.  An appropriate Order follows.

*s/Nora Barry Fischer*
Nora Barry Fischer
Senior U.S. District Judge

Dated:  August 6, 2025

cc/ecf: All counsel of record